## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re** | **Chapter 11** |
| **27 Putnam Ave LP, *et al*,[1]** | **Case no. 19-13412(RG)** |
| | **Jointly Administered** |
| **Debtor.** | |

## RESPONSE OF ELENA LUNYOVA, MICHELLE MORTENSEN, NICOLE SWEET AND THE GRAND PUTNAM TENANT ASSOCIATION IN OPPOSITION TO THE DEBTORS' FIRST OMNIBUS OBJECTION TO PROOFS OF CLAIM

TO:      THE HONORABLE ROBERT E. GROSSMAN
         UNITED STATES BANKRUPTCY JUDGE

Elena Lunyova, Michelle Mortensen, Nicole Sweet and the Grand Putnam Tenant Association (GPTA) (collectively "the Responding Parties), by and through their undersigned counsel, Ellery Ireland, hereby respond to *Debtor's First Omnibus Objection to Proofs of Claim* [Dkt. No. 45] (the "Objections").  In support of their Response, the Responding Parties state as follows:

### BACKGROUND

1.     The Debtors own four adjacent residential apartment buildings in the Clinton Hill neighborhood of Brooklyn, New York ("the Buildings"); they purchased the

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 27 Putnam Ave LP (7503); 90 Downing St LP (7503); 423 Grand Ave LP (7503); and 429 Grand Ave LP (7503).

1

buildings in 2016 and immediately began a campaign of tenant harassment that was calculated to push rent-stabilized tenants out of their apartments in anticipation of the expiration of a regulatory agreement[2] with the United States Department of Housing and Urban Development (HUD) that is administered locally by the New York City Department of Housing Preservation and Development.

2.    According to the Assurance of Discontinuance (AOD) dated September 19, 2019 and attached to the Objections as Exhibit B, "[Debtors'] business plan is to create vacancies in the portfolio's rent stabilized apartments…Based on the short-term financing Respondents obtained, they had pressure to obtain vacancies so that they could retire the loan through refinancing or selling the portfolio." AOD, ¶ 7. (emphasis added)

3.    In other words, Debtors' "value-added" strategy, from the beginning, implicitly entailed a short-term ownership of the Buildings, during which time Debtors would intentionally drive tenants out of their rent-stabilized apartments, in order that the rents for those apartments might be fraudulently inflated.

4.    As soon as Debtors purchased the Buildings, they commenced numerous unpermitted construction projects that sowed havoc throughout the Buildings: the Debtors improperly created duplexes that utilized the former cellar spaces that were subject to flooding; the tenants of the buildings complained of excessive dust and debris; the ceilings of two lobbies collapsed; as a result of the termination of the superintendent the public areas were unmaintained; tenants could not obtain necessary repairs, while at

---

[2] The Federal HOME Investment Partnership Program ("HOME Program").

the same time Debtors were creating new apartments without proper authorization; Debtors also distributed throughout the Buildings notices that the building was not, or soon would not be, subject to rent stabilization—and this conduct is the basis for the tenants' harassment claim: a wilful course of conduct to disrupt the peace and repose of the tenants so that they might vacate their apartments.

5.    In order to defend against this harassment and to protect themselves from the environmental hazards to which the Debtors had subjected them, the tenants of the Buildings organized themselves and created the Grand Putnam Tenant Association (GPTA), the duly-elected president of which is Karma Johnson.[3]

6.    The Tenant Association then filed a lawsuit against the Debtors and other related parties[4] ("the Supreme Court Litigation"); the initial purpose of the Supreme Court Litigation was to bring to a halt the reckless construction practices of the Debtors and to that end, the GPTA obtained a temporary restraining order enjoining Debtors from performing construction.

7.    On or about March 17, 2017, the Attorney General for the State of New York served upon Debtors a subpoena duces tecum seeking information relevant to the GPTA's allegations that Debtors had violated, *inter alia*, the law against tenant harassment, New York City Administrative Code §§ 27-2004 and 27-2005(d).

8.    Rather than comply with the Attorney General's subpoenas, the Debtors petitioned the New York State Supreme Court, Kings County to quash the Attorney

---

[3] A roster of the members of the GPTA is attached as **Exhibit A**.
[4] Kings County Supreme Court index number 6531/2016.

General's subpoenas[5]; this manoeuvre failed and the Debtors eventually cooperated with the Attorney General's investigation, which resulted in AOD.

9.    The Supreme Court Litigation, which was assigned to the Hon. Paul Wooten, was held in abeyance in order to allow the Attorney General's investigation to run its course; as the Attorney General's investigation wound up, the Debtors informed Judge Wooten that control of the Debtors would transfer to a new party; Judge Wooten conferenced the case several times while the AOD was being finalized.

10.    Judge Wooten was then appointed to the Appellate Division, Second Department, leaving two pending motions undecided; the Supreme Court Litigation was then assigned to the Hon. Johnny Lee Baynes, who recently died.

### DISCUSSION

11.    As a threshold matter, the Debtors' Objections are procedurally improper in that they do not conform to the requirements of Rule 3007[e][1], [2], [3] and [4] of the Federal Rules of Bankruptcy Procedure.

12.    Furthermore, the Debtors' Objections exceed the scope and purpose of an omnibus objection, set forth in Rule 3007[d].

**A. Elena Lunyova, Michelle Mortensen and Nicole Sweet**

13.    It is not disputed that Ms. Lunyova, Ms. Mortensen and Ms. Sweet (collectively "the Tenants") are tenants of the Debtors; each of the Tenants has filed an unsecured claim for rent overcharges.

---

[5] Kings County Supreme Court index number 512229/2017

14.   The Debtors seek to reduce, expunge or calculate their claims for an array of reasons that, for the most part, do not remotely justify the relief sought; but the Debtors' argument concerning the implications of recent Court of Appeals decision[6], needs to be addressed.

15.   It is clear that the Debtors are seeking to exploit the *Regina* decision—and the undeniable statutory ambiguity resulting therefrom—to hasten a resolution of these tenants' claims.

16.   Applying the Court of Appeals' decision in *Matter of Regina Metro. Co., LLC v. N.Y. State Div. of Hous. & Cmty. Renewal*, 2020 NY Slip Op 02127 to the to the Tenants' rent overcharge claims, the Debtors conclude that none of the claims has any merit and that no overcharge has occurred—a conclusion that far exceeds the scope of Rule 3007[d].

17.   *Regina* says many things, but it does not say all that the Debtors represent: for example, *Regina* does affect overcharge calculations, limiting the tenants to what was recoverable at the time the HSTPA was passed.

18.   Before the adoption of the HSTPA, under RSL § 26-516[a] a tenant could collect four years of overcharges, and for two of those four years a tenant could collect treble damages; after passage of the HSTPA, a tenant could collect six years of overcharges, all six of which could be treble damages, a change that substantially enlarged landlords' liability.

---

[6] *Matter of Regina Metro. Co., LLC v. N.Y. State Div. of Hous. & Cmty. Renewal*, 2020 NY Slip Op 02127 [2020].

19.    There is no gainsaying that *Regina Metro* qualified this statute somewhat, at least to cases pending when the HSTPA was passed in June 2019[7]: for cases that were pending when the HSTPA was adopted, the new "overcharge calculation and treble damages provisions in Part F may not be applied retroactively."

20.    What *Regina* does *not* do—and this is what the parties disagree on—is declare unconstitutional RSL § 26-516(h), as amended by the HSTPA[8]; RSL § 26-516(h) now confers upon DHCR and the courts plenary authority to review an entire rent history in order to ascertain what the legal regulated rent should be.

21.    The bone of contention, therefore, concerns a court's authority to review the entire rent history in order to determine the legal regulated rents; this authority to review an entire rent history is utterly distinct from the "overcharge and treble damages provision" found in RSC § 26-516[a][2], which was the focus of the *Regina* court's retroactivity analysis.

22.    Before adoption of the HSTPA, rent overcharge claims had a four-year statute of limitation, meaning a tenant could not challenge increases taken more than four years prior to the making of the claim; one very pertinent exception to that rule arises in

---

[7] Two of the overcharge claims (Lunyova and Mortensen) were raised <u>after</u> passage of the HSTPA, so it is an open question whether the *Regina* court's retroactivity analysis applies to these claims at all.

[8] In fact, in response to the dissent's accusation that the majority had invalidated all of Section F of the HSTPA, the majority wrote: "Although the dissent repeatedly suggests otherwise, in stark contrast to the holding in *Lochner*, in this case we are not invalidating or "striking down" the overcharge calculation provisions in the HSTPA. The only question presented and resolved here is whether those provisions — whose validity is not otherwise at issue in these appeals — may be applied retroactively." *Regina Metro,* at 61-2.

the even that there exist "indicia of fraud" rendering the base date rent unreliable and

justifying a review of the rent history prior to four years. *See generally, Matter of Grimm*

*v State of NY Div. of Hous. & Community Renewal Off. of Rent Admin.*, 15 NY3d 358

[2010]

23.   The HSTPA eliminated all barriers to a court's authority to review the

entire rent history of an apartment—in fact the new law *directs* courts to review the entire

rent history, and it is this provision that Debtors are attempting to challenge.

24.   Section 26-516(h) of the Rent Stabilization Law reads:

h. The division of housing and community renewal, and **the courts, in investigating complaints of overcharge and in determining legal regulated rents, shall consider all available rent history which is reasonably necessary to make such determinations, including but not limited to** (i) **any rent registration** or other records filed with the state division of housing and community renewal, or any other state, municipal or federal agency, regardless of the date to which the information on such registration refers; (ii) any order issued by any state, municipal or federal agency; (iii) any records maintained by the owner or tenants; and (iv) any public record kept in the regular course of business by any state, municipal or federal agency. Nothing contained in this subdivision shall limit the examination of rent history relevant to a determination as to:

(i) whether the legality of a rental amount charged or registered is reliable in light of all available evidence including but not limited to whether an unexplained increase in the registered or lease rents, or a fraudulent scheme to destabilize the housing accommodation, rendered such rent or registration unreliable;

(ii) whether an accommodation is subject to the emergency tenant protection act or the rent stabilization law;

(iii) whether an order issued by the division of housing and community renewal or by a court, including, but not limited to an order issued pursuant to section 26-514 of this chapter, or any regulatory agreement or other contract with any governmental agency, and remaining in effect within six years of the filing of a complaint pursuant to this section, affects or limits the amount of rent that may be charged or collected;

(iv) whether an overcharge was or was not willful;

(v) whether a rent adjustment that requires information regarding the length of occupancy by a present or prior tenant was lawful;

(vi) the existence or terms and conditions of a preferential rent, or the propriety of a legal registered rent during a period when the tenants were charged a preferential rent;
(vii) the legality of a rent charged or registered immediately prior to the registration of a preferential rent; or
(viii) the amount of the legal regulated rent where the apartment was vacant or temporarily exempt on the date six years prior to a tenant's complaint.

25.    Unequivocally, the new RSL § 26-516(h) *directs* all courts to review the entirety of a rent history, and there is nothing in the *Regina* discussion that invalidates that authority, especially when considering overcharge claims interposed after adoption of the HSTPA, which are not retroactive at all.

26.    The strength of this interpretation is confirmed by returning to the actual arguments of Court of Appeals against retroactive application of the "rent overcharge and treble damages provisions": "Rather than serving any of the policy goals of rent stabilization (which it would not), retroactive application of the overcharge calculation amendments would merely punish owners more severely for past conduct they cannot change — an objective we have deemed illegitimate as a justification for retroactivity." *Regina Metro*, at 58.

27.    Keeping with the reasoning of the Court of Appeals, even if levying a costlier penalty is illegitimate, expanding the court's authority to review an entire rent history *does* further the legitimate legislative goal of preserving the affordability of the housing stock, insomuch as it empowers a court to adjust fraudulently inflated rents that would have been barred by the old statute of limitations.[i]

28.    In summary, *Regina* affected the *calculation* of overcharges and the assessment of damages; *Regina* did not affect the *determination* of overcharges—whether

or not an overcharge has occurred—and the plenary power to review all available documents in order to ascertain the legal regulated rent, remains untouched.

29.    Turning now to the claim of Ms. Sweet, the Debtors argue that since January 2018 was the last rent payment Ms. Sweet paid rent, pre-HSTPA law governs— this argument is unintelligible and the Debtors do not provide a clear explanation for their method here: if the Debtors mean to argue, pursuant to *Regina*, that damages for overcharges occurring during 2015, 2016 and 2017 are to be calculated according to pre-HSTPA law, then they are on solid ground.

30.    Ms. Sweet's notice of claim was filed in February 2020, so the HSTPA should govern.

31.    However, that Ms. Sweet has not paid rent since January 2018 does not limit her to the forms of relief available in 2018; the Rent Stabilization Law as it stands today directs courts to review the entire rent history in order to determine the legal regulated rent; in Ms. Sweet's case, when she moved into 90 Downing Street, Apt. 38 in 2007, the rent for her apartment nearly doubled, rising from $573.86 to $1000.00, an increase of more that $425 that the standard increases cannot account for—this was fraudulent rent inflation and rent overcharge.

32.    The Debtors seek to persuade this Court cannot review the rent history from 2007, but that is plainly at odds with what RSL § 26-516(h) actually says.

33.    Turning to Ms. Lunyova, she moved into 90 Downing Street, Apt. 39 in 2009, the rent for her apartment nearly tripled, rising from $664.49 to $1,777.45; her overcharge counterclaim was interposed in January 2020, so the HSTPA clearly applies,

notwithstanding the Debtors' utterly misleading claim that "in accordance with *Regina*, this Court must apply the pre-HSTPA overcharge analysis wherein the rent four (4) years before the filing is the 'base date rent.'" Objections, ¶ 83.

34.    *Regina* changes only the assessment and calculation of damages; it does not otherwise change the HSTPA's new analysis of overcharge claims.

35.    However there is no greater indication of the Debtors' bad faith than their analysis of Ms. Mortensen's claim: "As Mortensen's overcharge claim originated at the commencement of her tenancy in August 2018, the holding in *Regina* mandates that pre-HSTPA law be applied in analysing whether or not Mortensen has an overcharge complaint or not." Objections, ¶ 96.

36.    This is simply not true; Ms. Mortensen's claim was filed in February 2020, so the HSTPA applies; the rent history for Ms. Mortensen's apartment indicates that in 2009 the rent for her apartment more than doubled, rising from $783.56 to $1,661.84, yet another increase that cannot be accounted for with the usual post-vacancy increases that a landlord was entitled to levy at the time; moreover, in 2011 her apartment was registered as exempt from regulation, when in fact it was not exempt.

37.    All three tenants have filed unsecured claims for damages stemming from rent overcharges; while the Debtors may have reservations about the merits of the claims, there is no uncertainty about the nature of the claims that would prevent them from assessing the validity of the claims.

### A. Grand Putnam Tenant Association

38.   The Debtors have argued that the GPTA does not have standing to interpose a claim for harassment. *See*, First Objections, ¶ 14, *et passim*.

39.   The Debtors correctly state that the GPTA is a voluntary, unincorporated membership association, and as such has standing to sue in its own right if, "(1) the organization's members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." First Objections, ¶ 18.

40.   At the same time, analysis of a party's standing rests "in part on policy consideration, that a person should be allowed access to the courts to adjudicate the merits of a particular dispute that satisfied the other justiciability criteria." First Objections, ¶ 20.

41.   From these premises, the Debtors catapault to the conclusion that the GPTA does not have standing, because "the claim are not common to all members of the association." First Objections, ¶ 24.

42.   The Debtor's conclusion is incorrect, because the Debtors mistake the nature of the relief sought: the Debtor's assume that the Tenant Association is seeking compensatory damages for harassment—which would be improper, relying as it would on the individual harm suffered by an individual tenant, as was the case in *Cambridge House Tenants' Assn. v Cambridge Dev.*, L.L.C., 2010 NY Slip Op 30117[U] [Sup Ct, NY County 2010]—when in actuality the GPTA is seeking *punitive damages* for harassment, which

does not necessarily entail an analysis of the injury sustained by individual tenants, focusing rather on the illegal conduct of the Debtors.

43.    The New York City anti-tenant harassment statute, NYC Admin. Code § 27-2005, states that, "the owner of a dwelling shall not harass any tenants or persons lawfully entitled to occupancy of such dwelling as set forth in paragraph 48 of subdivision a of section 27-2004 of this chapter."

44.    "Harassment" is defined by NYC Admin. Code § 27-2005[a][48] as:

> any act or omission by or on behalf of an owner that (i) causes or is intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy, and (ii) includes one or more of the following acts or omissions, provided that there shall be a rebuttable presumption that such acts or omissions were intended to cause such person to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy, except that such presumption shall not apply to such acts or omissions with respect to a private dwelling, as defined in paragraph six of subdivision a of section 27-2004:
>
> a. using force against, or making express or implied threats that force will be used against, any person lawfully entitled to occupancy of such dwelling unit;
>
> a-1. knowingly providing to any person lawfully entitled to occupancy of a dwelling unit false or misleading information relating to the occupancy of such unit;
>
> a-2. making a false statement or misrepresentation as to a material fact regarding the current occupancy or the rent stabilization status of a building or dwelling unit on any application or construction documents for a permit for work which is to be performed in the building containing the dwelling unit of any person lawfully entitled to occupancy of such dwelling unit if such building is governed by the New York city construction codes;
>
> b. repeated interruptions or discontinuances of essential services, or an interruption or discontinuance of an essential service for an extended duration or of such significance as to substantially impair the habitability of such dwelling unit;
>
> b-1. an interruption or discontinuance of an essential service that (i) affects such dwelling unit and (ii) occurs in a building where repeated interruptions or discontinuances of essential services have occurred;
>
> b-2. repeated failures to correct hazardous or immediately hazardous violations of this code or major or immediately hazardous violations of the New York city construction codes, relating to the dwelling unit or the common areas of the building containing such dwelling unit, within the time required for such corrections;
>
> b-3. repeated false certifications that a violation of this code or the New York city construction codes, relating to the building containing such dwelling unit, has been corrected;

12

b-4. engaging in repeated conduct within the building in violation of section 28-105.1 of the New York city construction codes;

c. failing to comply with the provisions of subdivision c of section 27-2140 of this chapter;

d. commencing repeated baseless or frivolous court proceedings against any person lawfully entitled to occupancy of such dwelling unit;

d-1. commencing a baseless or frivolous court proceeding against a person lawfully entitled to occupancy of such dwelling unit if repeated baseless or frivolous court proceedings have been commenced against other persons lawfully entitled to occupancy in the building containing such dwelling unit;

e. removing the possessions of any person lawfully entitled to occupancy of such dwelling unit;

f. removing the door at the entrance to an occupied dwelling unit; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying a key to the new lock to the persons lawfully entitled to occupancy of such dwelling unit;

f-1. contacting any person lawfully entitled to occupancy of such dwelling unit, or any relative of such person, to offer money or other valuable consideration to induce such person to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy, for 180 days after the owner has been notified, in writing, that such person does not wish to receive any such offers, except that the owner may contact such person regarding such an offer if given express permission by a court of competent jurisdiction or if notified in writing by such person of an interest in receiving such an offer;

f-2. contacting any person lawfully entitled to occupancy of such dwelling unit to offer money or other valuable consideration to induce such person to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy, unless such owner discloses to such person in writing (i) at the time of the initial contact, and (ii) in the event that contacts continue more than 180 days after the prior written disclosure, at the time of the first contact occurring more than 180 days after the prior written disclosure:

(1) the purpose of such contact,

(2) that such person may reject any such offer and may continue to occupy such dwelling unit,

(3) that such person may seek the guidance of an attorney regarding any such offer and may, for information on accessing legal services, refer to The ABCs of Housing guide on the department's website,

(4) that such contact is made by or on behalf of such owner,

(5) that such person may, in writing, refuse any such contact and such refusal would bar such contact for 180 days, except that the owner may contact such person regarding such an offer if given express permission by a court of competent jurisdiction or if notified in writing by such person of an interest in receiving such an offer,

(6) (i) the median asking rent for a dwelling unit in the same community district, provided that the department has reported such data pursuant to    section 27-2096.2, within the previous twelve-month period; or (ii) the median    asking

13

rent for a dwelling unit in the same community district with the same number of bedrooms, provided that the department has reported such data, pursuant to section 27-2096.2, within the previous twelve-month period,

(7) that there is no guarantee that such person will be able to rent a dwelling unit in the same community district with the same number of bedrooms as the dwelling unit that such person is currently lawfully entitled to occupancy of, for the same rent such person is paying at the time of such contact, and

(8) that additional factors may impact the ability of such person to rent a dwelling unit, including, but not limited to, the current employment and credit history of such person;

f-3. offering money or other valuable consideration to a person lawfully entitled to occupancy of such dwelling unit to induce such person to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy while engaging in any of the following types of conduct:

(1) threatening, intimidating or using obscene language;

(2) initiating communication with such frequency, at such unusual hours or in such a manner as can reasonably be expected to abuse or harass such person;

(3) initiating communication at the place of employment of such person without the prior written consent of such person; or

(4) knowingly falsifying or misrepresenting any information provided to such person;

f-4. repeatedly contacting or visiting any person lawfully entitled to occupancy of such unit (i) on Saturdays, Sundays or legal holidays, (ii) at times other than the hours between 9 a.m. and 5 p.m. or (iii) in such a manner as can reasonably be expected to abuse or harass such person, provided that if such person has notified such owner in writing that such person consents to being contacted or visited at specified hours or in a specified manner, such owner may also contact or visit such person during such specified hours and in such specified manner, and provided further that an owner may contact or visit such person for reasons specifically authorized or mandated by law or rule; or

f-5. threatening any person lawfully entitled to occupancy of such dwelling unit based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service,    sexual orientation, alienage or citizenship status, status as a victim of domestic    violence, status as a victim of sex offenses or stalking, lawful source of income or    because children are, may be or would be residing in such dwelling unit, as such    terms    are defined in sections 8-102 and 8-107.1 of the code;

f-6. requesting identifying documentation for any person lawfully entitled to occupancy of such dwelling unit that would disclose the citizenship status of such person, when such person has provided the owner with a current form of government-    issued personal identification, as such term is defined in section 21-908, unless such documentation is otherwise required by law or is requested for a specific and limited purpose not inconsistent with this paragraph.

g. other repeated acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace or quiet of any person lawfully entitled to occupancy of such dwelling unit and that cause or are intended to cause such person to vacate such dwelling unit or to surrender or waive any rights in relation to such

occupancy, including improperly requiring such person to seek, receive or refrain from submitting to medical treatment in violation of subdivision b of section 26-1201.

45.    In a recent, as-yet unpublished decision that engages in extensive analysis of the harassment statute[9], the Hon. Jack Stoller of New York County Housing Court, paraphrased the entire statute as prohibiting, "any omission that substantially interferes with the comfort of any tenant."

46.    In the event that a landlord engages in harassment, NYC Admin. Code § 27-2115[o] authorizes a court to award *punitive* damages and attorney's fees; even in the absence of the proof of the extent of *actual* damages, the same statute authorizes a court to award individual *compensatory* damages of $1,000.00.

47.    Punitive damages would serve the salutary purpose of discouraging the types of practices that the Debtors, now controlled by the secured creditor, are still engaged in.[10]

48.    The Debtor's conduct giving rise to the GPTA's claim for punitive damages is abundantly documented in the Supreme Court filings and AOD, but, briefly,

---

[9] *Allen v. 219 24th Street LLC*, Index No. 57401/2019 [Civ Ct, NY County 2020], attached hereto as **Exhibit B**. It is noteworthy that Judge Stoller awarded $20,000 in punitive damages *to each tenant*, specifically holding that, "punitive damages at $20,000 each for each of the six Petitioners is neither excessive but, at a total of $120,000, substantial enough to deter similarly-situated property owners." Attorneys for the landlord in *Allen* were Belkin Burden Goldman LLP. Given this recent decision, the GPTA's claim for punitive damages should be increased, and an amended notice of claim is forthcoming.

[10] At the meeting of the creditors on January 16, 2020, I specifically asked the Debtors' representatives, Mr. Amirian and Ms. Lucenko, if the Debtors were contemplating any further work to convert apartments in duplexes, and both Mr. Amirian and Ms. Lucenko indicated under oath that the Debtors' were not contemplating any conversion work. On or about January 7, 2020, the New York City Department of Buildings issued a stop work order and eight violations, with fines amounting to more than $24,000.

include: frivolous litigation; inadequate maintenance; unpermitted construction; false and misleading statements to tenants concerning the regulatory status of the Buildings (not individual tenancies); and fraud.

49.   To return to the elements of the Tenant Association's standing, the individual members would clearly have standing to sue for harassment; the interests the Tenant Association is seeking to protect are germane to the purpose of the Tenant Association, which is to protect the tenants from abusive real estate speculators; and finally the GPTA claim for punitive damages does not require the participation of any individual tenant, since it derives exclusively from the Debtors' conduct toward all of the tenants.

## CONCLUSION

50.   For the foregoing reasons the Responding Parties request that the Court overrule the Debtors' First Objection, along with such other relief that the Court deems appropriate.

Dated:   New York, New York
         May 11, 2020                  Respectfully submitted,


                                  **LAW OFFICE OF ELLERY IRELAND**

                                  _Ellery Ireland_
                                  Ellery Ireland, Esq.
                                  116 Pinehurst Avenue, T43
                                  New York, NY 10033
                                  eaiesq@gmail.com
                                  (212) 897-5840

16

[i] A similar concern is raised by the City of New York in its objection to the Debtors motion to confirm the settlement [Dkt. 43]: "Suffice it to say that this type of regulatory issue should not be subject of a settlement between one tenant and the Debtors, to which other federal, state and local authorities are not a party." ¶ 8. A "free and clear" sale under section 363(f) of the Bankruptcy Code, without adequate court-ordered protection for the tenants of the Buildings and the public at large, would in effect be a circumvention of the New York State rent regulatory regime, and would codify—insulating from future rents—illegal rents that the Debtors know are illegal.